UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x

CASE LEROY,

                       Plaintiff,          Docket No. 21-cv-6008(NSR)

      -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor Central
School District

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


                                              JEROME T. DORFMAN
                                              Attorney for Plaintiff
                                              8 Breezy Hill Road
                                              Parksville, New York 12768
                                              (845) 747-9403
                                              jdlawny@verizon.net

Preliminary Statement

This action was brought for an injunction to vacate the Plaintiff's suspension from school and school activities and direct the Defendants to reinstate the Plaintiff to all rights and privileges. The New York Supreme Court granted plaintiff a preliminary injunction directing defendant to allow plaintiff to participate in graduation ceremonies, the only remaining event from which he was suspended. It is also brought to obtain damages for violation of the Plaintiff's civil rights under the New York State Constitution, the First Amendment to the United States Constitution, and 42 U.S.C. §1983. It also seeks damages for defamation of the Plaintiff's character. The facts surrounding this proceeding are not in dispute.

STATEMENT OF FACTS

The Plaintiff is a senior at Livingston Manor High School and has been a student in the Livingston Manor Central School District throughout his elementary and secondary education. He is a special education student due to the disabilities that he has. He also attended a "public safety" program given by BOCES. The Plaintiff was a member of the High School football and baseball teams. Prior to this suspension he had never been the subject of a disciplinary proceeding. On or about March 25, 2021, he was in a class with two fellow students from his public safety program. One of the students asked the other to demonstrate a "hold" that they were taught to use to restrain someone. As they were doing that, the Plaintiff took a photograph of them and sent it to each of them. Someone added the caption "looks almost to (sic) realistic" and posted it.[1] On or about April 19, 2021, the Plaintiff was with several friends after dropping off one of the friend's sister at dance class. The driver of the car asked him to look under it to see if he could find the cause of a noise he

---

[1] The Plaintiff believes that he did not post the first photograph, but only sent it to the two students depicted therein, who may have posted it themselves.

heard. While he was on the ground, another friend posed on his back and jokingly told him that he was under arrest "for dating a minor," referring to the fact that he was dating a young girl under the age of majority. Another of his friends took a picture of him with his friend on his back and sent it to him. (See Exhibit A to the Plaintiff's affidavit). Going along with the joke, he added the caption, "cops got another one" and posted it online at Snapchat. Shortly thereafter, he saw that his friend had altered his photograph by changing the caption to "Another one down" and added a "Black Lives Matter" logo to it. (See Exhibit B to the Plaintiff's affidavit) Realizing that it changed the entire context of his original posting, such that it could be misinterpreted from his original intention, he told him to remove it, which he did. Within seven minutes both his and his friend's postings were removed. In that short period of time another student in his class[2], took a screen shot of the friend's posting, adding the Plaintiff's name to it, as well as and language decrying it as "racist" and urging people to bring it to the attention of the Defendants. She then disseminated it to a large group people, including the school Superintendent, defendant John P. Evans (hereinafter referred to as "the Superintendent).

The next day the Plaintiff was called into the Superintendent's office and was questioned about the photographs. He told him about the circumstances under which the second photograph was taken, how it had been altered by his friend, and that they were removed within minutes after being posted. Immediately thereafter, he was summarily sent home and suspended from attending school for five days.

---

[2] It is the Plaintiff's belief that student held a grudge against him and did this solely in order to cause him trouble.

On or about April 24, 2021, the Plaintiff's parents received a letter from the Superintendent, containing five charges that were being brought against him and notifying them that a hearing would be held with respect to them on April 27, 2021. (See Exhibit C to the Plaintiff's affidavit)

On April 27, 2021, the Plaintiff attended the hearing along with his parents and testified consistently with what he had told the Superintendent, which the latter acknowledged in his testimony.

At the hearing, the Superintendent testified that the Plaintiff created a disruption to the school process by posting the two photographs, leading to protests by some students in school and causing him to convene an assembly of all of the students in grades 7 to 12 to address the matter. At the assembly, he told the students and faculty that "a lot of people viewed [the photographs] as racist in nature," that "it had no place in our school," and that "it was being addressed and being investigated." He then allowed some of the students to remain in the school gym and conduct their protest. He did not testify that there was any disruption of classes or school activities as the result of the posting of the two photographs, only that there was "a kind of buzz up the building."

On April 28, 2021, the hearing examiner, Kate Reid, Esq., issued a document entitled "Findings of Fact and Recommendation". In it she found the Plaintiff guilty of the first charge of "Engaging in any willful act which disrupts the normal operation of the school community" and the fifth charge of "Engage in off-campus misconduct which interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function." She found the Plaintiff not guilty of the three other charges. She did not find that the Plaintiff discriminated against or harassed anyone and recommended that in addition to the five-day suspension which had already been imposed, the Plaintiff be further suspended until May 21, 2021.

4

However, the Superintendent did not limit the discipline to that which had been recommended by the hearing examiner and, in addition to suspending The Plaintiff from attending classes through May 21, 2021, suspended The Plaintiff from participating in any school activities for the remainder of the school year, including sports, the school trip, the senior prom, and attending graduation ceremonies. The Plaintiff was later allowed to attend classes on condition that he sign a student conduct agreement. But the suspension from school activities was not rescinded. As a result, The Plaintiff missed the opportunity to participate in the championship football game or play on the school's baseball team. He also missed attending the senior trip with his classmates, as well as the senior prom. But for the suspension being set aside by the state court, he would have missed the once-in-a-lifetime opportunity to attend graduation ceremonies.

The Plaintiff appealed the decision of the Superintendent to the School Board, which refused to change the findings or the discipline imposed.

None of the charges relate to conduct that took place on school grounds or at a school function. Neither of the two photographs that the Plaintiff posted mentioned the school, its staff, nor any other student.

# POINT I

The Order of the New York State Supreme Court
Granting Plaintiff a Preliminary Injunction Against
Defendant's Enforcement of its Suspension of Plaintiff
Constitutes a Finding that Defendant Violated
Plaintiff's Civil Rights and is Law of the Case
Precluding Defendant from Relitigating that Issue

The doctrine of law of the case is clearly applicable to this action. That doctrine prevents relitigation of an issue that has previously been decided in the action. In finding that plaintiff was entitled to a preliminary injunction against defendant's continued enforcement of its suspension of plaintiff , the New York Supreme Court necessarily found that there was a substantial likelihood of plaintiff's success on the merits. Doe v. Axelrod, 73 NY 2d 748 1988; Grant Co. v Srogi, 52 N.Y.2d 496, 517 1981. Absent a showing of a change in facts or law, a prior decision on an issue precludes defendant from relitigating it. Erickson v. Cross Ready Mix, Inc., 98 A.D.3d 717, 717 (2d Dept. 2012); Martin v. City of Cohoes, 37 N.Y.2d 162, 165 (1975); Martin v. City of Cohoes, 37 N.Y.2d 162, 165 (1975) The single immutable fact in this case is that plaintiff was suspended by defendant. Nothing has changed or can change about that. Neither has there been any change in the law. The decision of the United States Supreme Court in BL v. MAHANOY AREA SCHOOL DISTRICT, 594 U.S. ___ (2021), discussed below, definitively determined that a student cannot be disciplined for speech that occurs outside of school and which has no nexus to the school. Accordingly, defendant is bound by the decision of the New York Supreme Court, finding that plaintiff's suspension by defendant was in violation of plaintiff's civil rights.

POINT II

Defendants' Suspension of Plaintiff
Violated His Right of Free Speech

Even if the Court allows defendant to contest the prior finding that it violated plaintiff's civil rights, it cannot prevail. Our research has not disclosed a single case approving of the suspension of a student for actions which took place entirely outside the school or at a school sponsored event or activity, and which did not directly or impliedly make reference to the school, its administrators, faculty, staff, or another student. The United States Supreme Court has decided several cases which involved free speech in the school context.[3] The first of these was Tinker v. Des Moines Independent Community School Dist., 393 US 503 1969. In Tinker, students were disciplined for refusing to remove black armbands in school as a protest against the Vietnam War. The Court held that,

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. Tinker, at 508.

It found that,

> There is no indication that the work of the school or any class was disrupted. Outside the classrooms, a few students made hostile remarks to the children wearing armbands, but there were no threats or acts of violence on school premises.

The Court also held that,

> The District Court [in dismissing the complaint] concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands.

---

[3] All of those cases involved actions by a student within the school or at a school sponsored event.

> But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk (citation omitted) and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.
>
> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. (citation omitted) <u>Tinker</u> at 508-509

It further held that,

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views. As Judge Gewin, speaking for the Fifth Circuit, said, school officials cannot suppress "expressions of feelings with which they do not wish to contend. <u>Tinker</u> at 511.

The Court noted that the school's rules did not even prohibit students from wearing an Iron Cross in school, a traditional symbol of Nazism.

In Burnside v. Byars, 363 F. 2d 744, 5th Cir. 1966, cited in Tinker, students were prohibited from wearing buttons in school saying, "One Man One Vote," as a protest against racial discrimination. The Court held,

> .... we must also emphasize that school officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students' right to free and unrestricted expression as guaranteed to them under the First Amendment to the Constitution, where the exercise of such rights in the school buildings and schoolrooms do not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.

In Morse v. Frederick, 551 US 393 2007, students at a school-sanctioned and school-supervised event unfurled a banner that read, "BONG HiTS 4 JESUS". The school principal directed them to take it down. Upon the refusal of one of them to do so, he was suspended. The Court held that the banner promoted illegal drug use and that the principal and the school superintendent did not infringe upon the student's right of free speech in directing him to take it down. Referring to the holding in Bethel School Dist. No. 403 v. Fraser, 478 US 675 1986, wherein a student's discipline for delivering a speech at a school assembly using "an elaborate, graphic, and explicit sexual metaphor" was upheld, the Court was careful to note that,

> Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected. Morse, *supra* at 2021.

Thus, the Court distinguished conduct by a student outside of school from that which takes place within the school context.

In Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 216 (3d Cir. 2011), a student used his grandmother's computer to access a social networking web site where he created a parody "profile" of his High School principal. Upon learning that he had done sso, the school district

charged him with a violation of the school district discipline code and, after conducting an informal hearing, suspended him. The Court held,

> It would be an unseemly and dangerous precedent to allow the state, in the guise of school authorities, to reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities. Allowing the District to punish [the plaintiff] for conduct he engaged in while at his grandmother's house using his grandmother's computer would create just such a precedent, and we therefore conclude that the district court correctly ruled that the District's response to [the plaintiff's] expressive conduct violated the First Amendment guarantee of free expression.

Thomas v. Board of Educ., 607 F.2d 1043 (2d Cir. 1979) involved a publication created by a group of students outside of school. It was printed outside of the school and no copies were sold on school grounds. The Court noted that any activity relating to the publication that took place within the school building was *de minimis*. Initially, the school took no action against the students. However, at the urging of the president of the school board, who found the publication to be offensive, the school suspended the students. The Court held that,

> We may not permit school administrators to seek approval of the community-at-large by punishing students for expression that took place off school property. Nor may courts endorse such punishment because the populace would approve. The First Amendment will not abide the additional chill on protected expression that would inevitably emanate from such a practice. Thomas, at 1051.

That is exactly what occurred here. The Superintendent testified that he received numerous complaints from parents and students, as well as from people outside the school community. He also received inquiries from the press, as well as from a local television station. Undoubtedly, his decision to take disciplinary action was motivated by the pressure on the School District to do

something to satisfy the clamor, even though the Plaintiff's posting bore not the slightest nexus to the school.

<u>JS EX REL. SNYDER V. BLUE MOUNTAIN SCHOOL DIST.</u>, 650 F. 3d 915 3rd Circuit 2011 was another case in which a student created a fake profile of the principal of the school she was attending on a social networking website.[4] The profile contained "crude content and vulgar language, ranging from nonsense and juvenile humor to profanity and shameful personal attacks aimed at the principal and his family." The student was suspended for her posting and filed suit against the school district for violation of her right to free speech. The School District asserted that the profile disrupted school because there were general "rumblings" in the school regarding the profile. Although the lower court found that there had not been a "substantial and material" disruption of the school process, it nonetheless granted summary judgment dismissing the student's complaint. The Court of Appeals reversed, holding,

> Thus, under the Supreme Court's precedent, the Fraser exception to Tinker does not apply here. In other words, Fraser's "lewdness" standard cannot be extended to justify a school's punishment of J.S. for use of profane language outside the school, during non-school hours. <u>Snyder</u> at 932

It went on to state,

> Under these circumstances, to apply the Fraser standard to justify the School District's punishment of J.S.'s speech would be to adopt a rule that allows school officials to punish any speech by a student that takes place anywhere, at any time, as long as it is about the school or a school official, is brought to the attention of a school official, and is deemed "offensive" by the prevailing authority. Under this standard, two students can be punished for using a vulgar remark to speak about their teacher at a private party, if another student overhears the remark, reports it to the school authorities, and the

---

[4] As in this case, the plaintiff took steps to remove her posting from public view.

> school authorities find the remark "offensive." There is no principled way to distinguish this hypothetical from the facts of the instant case. Snyder at 933

It concluded that,

> Neither the Supreme Court nor this Court has ever allowed schools to punish students for off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school. Snyder at 933

Thus, despite the court's finding the fake profile to be lewd and vulgar, it nonetheless held that factor to be insufficient to "pass constitutional muster" under Tinker. The facts in this case are even more attenuated from the facts in Snyder, in that the photograph posted by the Plaintiff did not even relate to the school or anyone associated with it.

The seminal case on the exact issue involved herein is BL v. MAHANOY AREA SCHOOL DISTRICT, 594 U.S. ___ (2021). That is, whether a student can be disciplined for out of school conduct of posting a photograph on Snapchat that bears no nexus to the school. The plaintiff in that action, venting her displeasure at not being elevated from the junior varsity to the varsity cheerleading squad, posted a picture of herself and a friend on a social media website with their middle fingers raised and bearing the caption, ""Fuck school fuck softball fuck cheer fuck everything." As was the case here, another student took a screen shot of the posting and brought it to the attention of one of the cheerleading coaches, expressing her concern that the posting was inappropriate. Deeming it a violation of team and school rules requiring cheerleaders to "have respect for [their] school, coaches, ... [and] other cheerleaders"; avoid "foul language and inappropriate gestures"; and refrain from sharing "negative information regarding cheerleading, cheerleaders, or coaches ... on the internet", the school removed her from the junior varsity team. The

plaintiff sued, *inter alia*, for violation of her right to freedom of speech. The District Court granted summary judgment to the plaintiff, ruling that her posting was off-campus speech and not subject to regulation by the school district. The Third Circuit Court of Appeals affirmed the lower court's ruling in an extensive, well-reasoned opinion. Although recognizing "that the boundary demarcating schools' heightened authority to regulate student speech is not constructed solely of the bricks and mortar surrounding the school yard". BL at 178 (quotation marks omitted)  It concluded that,

> Equally well established, however, is that "the `school yard' is not without boundaries and the reach of school authorities is not without limits." Layshock, 650 F.3d at 216. School officials, in other words, may not "reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities." Id. Permitting such expansive authority would twist Tinker's limited accommodation of the "special characteristics of the school environment," 393 U.S. at 506, 89 S.Ct. 733, into a broad rule reducing the free speech rights of all young people who happen to be enrolled in public school. BL at 179

The Supreme Court, in affirming the rulings of the District Court and the Court of Appeals set out three features of off-campus speech that "often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech." It delineated them as follows:

> *First*, a school, in relation to off-campus speech, will rarely stand *in loco parentis*. The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them. Geographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility.
>
> *Second*, from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour

13

> day. That means courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all. *When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention.* (emphasis added)
>
> *Third*, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection. Thus, schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it" (citations omitted).
>
> * * *
>
> Given the many different kinds of off-campus speech, the different potential school-related and circumstance-specific justifications, and the differing extent to which those justifications may call for First Amendment leeway, we can, as a general matter, say little more than this: Taken together, these three features of much off-campus speech mean that *the leeway the First Amendment grants to schools in light of their special characteristics is diminished*. *Mahanoy* slip opinion 7-8 (emphasis added)

The Court noted that, as was the case here, the plaintiff's posts appeared outside of school hours from a location outside the school. Also as here, she did not identify the school in her posts or target any member of the school community with vulgar or abusive language. She also transmitted her speech through a personal cellphone, to an audience consisting of her private circle of Snapchat friends. The Court opined that, "These features of her speech, while risking transmission to the school itself, nonetheless ... diminish the school's interest in punishing B. L.'s utterance." *Mahanoy* slip opinion at 9. Although the plaintiff's speech was deemed vulgar, the Court noted that the

14

school's interest in curbing vulgarity "is weakened considerably by the fact that [the plaintiff] spoke outside the school on her own time." Citing *Morse v. Frederick*, 551 U. S. 393, 409 (2007) (if the student "delivered the same speech in a public forum outside the school context, it would have been protected") and *Bethel School Dist. No. 403 v. Fraser*, 478 U. S. 675, 684 (1986) ("had [the student] given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate"), it found that,"[the plaintiff had] uttered the kind of pure speech to which, were she an adult, the First Amendment would provide strong protection." *Mahanoy* at 8

In a concurring opinion by Justice Alito (in which Justice Gorsuch joined), he stated,

> ... there is a category of speech that is almost always beyond the regulatory authority of a public school. This is student speech that is not expressly and specifically directed at the school, school administrators, teachers, or fellow students and that addresses matters of public concern, including sensitive subjects like politics, religion, and social relations. Speech on such matters lies at the heart of the First Amendment's protection (citations omitted), and the connection between student speech in this category and the ability of a public school to carry out its instructional program is tenuous.
>
> If school tried to regulate such speech, the most that it could claim is that offensive off-premises speech on important matters may cause controversy and recriminations among students and may thus disrupt instruction and good order on school premises. But it is a "bedrock principle" that speech may not be suppressed simply because it expresses ideas that are "offensive or disagreeable."

Justice Alito pointed out the concession by the [school district's attorney] that,

> ... even if such speech is deeply offensive to members of the school community and may cause a disruption, the school cannot punish the student who spoke out; "that would be a heckler's veto." (citation omitted) (footnote omitted) The school may suppress the disruption, but it may not punish the off-campus speech that prompted other students to engage in misconduct. (citation omitted) "[I]f listeners riot because they find speech offensive, schools should punish the rioters,

not the speaker. In other words, the hecklers don't get the veto" (citation omitted).

He went on to state,

> This is true even if the student's off-premises speech on a matter of public concern is intemperate and crude. When a student engages in oral or written communication of this nature, the student is subject to whatever restraints the student's parents impose, but the student enjoys the same First Amendment protection against government regulation as all other members of the public.

It is inarguable that the plaintiff's posting was not expressly and specifically directed at the school, school administrators, teachers, or fellow students. Even if the ambiguous photograph that the plaintiff posted could somehow be viewed as having racist implications, which he by no means concedes, that would a matter of public concern, about which the plaintiff had a constitutional right to express an opinion.

This brings us to another identity of the instant case to *Mahanoy*, the failure to meet the requirement announced in *Tinker v. Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), that the conduct must have resulted in a "substantial disruption" at the school. The *Mahanoy* Court stated, "we can find no evidence in the record of the sort of "substantial disruption" of a school activity or a threatened harm to the rights of others that might justify the school's action" (citation omitted). Neither was there any such disruption in this case. Superintendent Evans did not testify that any classes or school activities were disrupted as the result of the one photograph that was briefly posted by the plaintiff. All he could say was that there was "a kind of buzz up the building." Though his decision to convene an assembly of all of the students in grades 7-12 may have taken a short time out from the regular educational process, it was entirely optional on his part and not a necessity. If the subject matter of the assembly was desirable, it could have taken place at any time and not related

to any of the event that led up to the plaintiff's suspension. Thus, the conduct cited by the defendants as a disruption of the school is plainly insufficient to satisfy the *Tinker* standard.

There can be no doubt that the Supreme Court's decision in *Mahanoy* definitively determines the issue of whether the plaintiff's right to free speech was violated by the defendants.

A key factor in all of these cases was whether the actions of the students posed a palpable, severe threat to the educational process. Mere apprehension of discord is insufficient. There was none here. As the court observed in <u>Snyder</u>, *supra*, "If anything, [the principal's] response to the [fake] profile exacerbated rather than contained the disruption in the school." Here, convening an assembly of all students in grades 7-12 and announcing that "[the posting] was being addressed and being investigated" only added to the discord, as it implied that the school had an interest in the posting and had a reason to investigate it, thereby placing the imprimatur of the School District on the view that the posting was racist in nature. The School District had no cause to involve itself in a matter which did not concern it, as it took place entirely outside of the school and did not relate to the school in any manner.

### POINT III

The Superintendent's Statements
Before the Entire 7-12 Grades
and the Faculty and Staff
Were Slanderous *Per Se*

In testimony at the Superintendent's hearing, the Superintendent admitted that he stated to the entire student body in grades 7-12, as well as faculty and staff, "a lot of people viewed [the photographs] as racist in nature", that "it had no place in our school" and that "it was being addressed and being investigated." Standing alone, that would not constitute slander against plaintiff. But his following up with suspending plaintiff placed the imprimatur of defendant behind the view

17

that his photograph was racist. That non-verbal conduct completed the slander. It made clear that upon completion of his investigation, his prior words were directed at plaintiff and that defendant held the view that the photograph was racist. It cannot be argued that calling a person a "racist" is not slanderous *per se*.

CONCLUSION

In light of the prior litigation of this issue and the indisputable violation of the Plaintiff's constitutional rights, the Court should grant him summary judgment on that issue. Summary judgment should also be granted with respect to plaintiff's cause of action for defamation.

Respectfully submitted,

_____
Jerome T. Dorfman