21-cv-6008 (NSR)

# MANDATE

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30th day of October, two thousand twenty-five.

Before:     Barrington D. Parker,
            Beth Robinson,
            Myrna Pérez,
                *Circuit Judges.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan 05, 2026

---

Case Leroy,

            Plaintiff - Appellant,

    v.

Livingston Manor Central School District, John P.
Evans, in his capacity as Superintendent of Schools of
Livingston Manor Central School District,

            Defendants - Appellees.

**JUDGMENT**

Docket No. 24-1241

---

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs.

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

*Catherine O'Hagan Wolfe*

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe*

MANDATE ISSUED ON 01/05/2026

24-1241-cv
*Leroy v. Livingston Manor Central School District*

# United States Court of Appeals
## for the Second Circuit

———————————————

August Term 2024
Argued: March 19, 2025
Decided: October 30, 2025

No. 24-1241

———————————————

CASE LEROY,

*Plaintiff-Appellant,*

— v. —

LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT,
JOHN P. EVANS, in his capacity as Superintendent of
Schools of Livingston Manor Central School District,

*Defendants-Appellees.*

———————————————

Appeal from the United States District Court
for the Southern District of New York
No. 7:21-cv-6008, Nelson S. Román, *Judge*

———————————————

Before:       PARKER, ROBINSON, and PÉREZ, *Circuit Judges.*

Case Leroy, a high school senior in a New York public school, took a picture
with his friends and posted it on social media while outside of his school campus

and after school hours. He thought his post, which showed a picture of his friend kneeling on his neck with the caption "Cops got another," was a joke, but he quickly realized others viewed it as racist because it evoked memories of the notorious murder of George Floyd. He removed his post after a few minutes, but not before another student took a screenshot, which was reposted on other social media platforms. After public outcry, in-school discussions, an assembly, a student demonstration, and a school investigation, the school superintendent suspended Leroy and barred him from participating in non-academic extracurricular activities for the remainder of the school year.

Leroy sued, alleging that the school's disciplinary actions violated the First Amendment. The district court granted the school's motion for summary judgment, concluding that the school did not violate Leroy's First Amendment rights because his off-campus speech caused substantial disruption in school.

We disagree. Accordingly, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings.

Judge Pérez concurs in the judgment in a separate opinion.

———————————————————

FOR APPELLANT: JEROME T. DORFMAN, Law Offices of Jerome T. Dorfman, Parksville, NY; ADAM EZRA SCHULMAN, Hamilton Lincoln Law Institute, Washington, D.C.

AMICUS CURIAE ARGUING FOR APPELLANT: EUGENE VOLOKH, Hoover Institution, Stanford University, Stanford, CA.

FOR APPELLEES: STEVEN C. STERN, CHELSEA WEISBORD, MARK A. RADI, Solokoff Stern LLP, Carle Place, New York.

BARRINGTON D. PARKER, *Circuit Judge*:

Case Leroy, a high school senior in a New York public school, appeals from a judgment of the United States District Court for the Southern District of New York (Roman, J.). Leroy was disciplined by his school after he took a picture with his friends and posted it on social media while outside of his school campus and after school hours. He thought his post, which showed a picture of his friend kneeling on his neck with the caption "Cops got another," was a joke, but he quickly realized others viewed it as an insensitive comment on the murder of George Floyd. He removed his post after a few minutes, but not before another student took a screenshot, which she reposted on other social media platforms. The photograph then took on a life of its own. After public outcry, in-school discussions, student demonstrations and a school investigation, the school superintendent suspended Leroy and barred him from participating in various school activities for the remainder of the school year.

Leroy then sued in state court, alleging that the school's disciplinary actions violated the First Amendment. The defendants removed the case to federal court and, following discovery, moved for summary judgment. The district court granted the motion, concluding that the defendants had not violated Leroy's First

Amendment rights because his off-campus speech caused substantial disruption in school.

On appeal, Leroy contends that the district court erred because any disruption that occurred did not deprive his off-campus speech of First Amendment protection. In analyzing this contention, we consider (i) the nature of Leroy's speech, (ii) where, when, and how he spoke, and (iii) the school's interests in regulating that speech, in light of the features of off-campus speech identified by the Supreme Court that "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway," *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021). We conclude that the school's disciplinary actions violated the First Amendment. Accordingly, we **REVERSE** the judgment of the district court and remand for further proceedings.

## BACKGROUND

On April 19, 2021, Case Leroy—then a senior at Livingston Manor High School, in the Livingston Manor Central School District (the "District"), took a picture in the parking lot of a dance studio with a group of friends. In the picture, Leroy is lying on the ground next to a car, and another student is kneeling on the

pavement beside him. The student has his knee on Leroy's neck and is giving a "thumbs up" and smiling.

The context of the picture is significant: The day Leroy and his friends took and posted the picture, a jury had just begun to deliberate in the highly publicized trial of Derek Chauvin, a Minnesota police officer, for the murder of George Floyd. The picture is undeniably reminiscent of footage of Chauvin next to a police car kneeling on George Floyd's neck, killing him. The other students involved in the picture—the student who took the picture (Student B) and the student posing with his knee on Leroy's neck (Student A)—both acknowledge this resemblance, and Student A testified the resemblance was intentional.

Leroy, however, testified that he was not aware of the resemblance until later. In fact, he says he was not involved in the decision to stage and take this photo at all. He testified that another friend told him that he heard a scraping sound under his car; Leroy went to look underneath the car to see what was causing the sound, and while he was lying next to the car, Student A came over and knelt on his neck for the picture.

Student B, who took the picture, sent it to the others via Snapchat, a social media and messaging app on which users can send a message directly to one or

more of their "friends" or can post a story that is visible to all of their "friends" for twenty-four hours. Leroy and his friends all posted the picture to their Snapchat stories. Leroy posted it while still in the parking lot outside the dance studio, adding the caption "Cops got another." Student A posted the same picture with the Black Lives Matter logo and the caption "Another one down." Within minutes, Leroy's phone started "blowing up" with messages, including what he describes as "threat messages." App'x 116. Leroy testified that he then looked at Student A's post with the Black Lives Matter logo and understood the resemblance to the George Floyd case. Leroy immediately took down his post. He also asked Student A to do the same, telling him that it "wasn't right." App'x 113. In total, Leroy's post was visible for about seven minutes.

As with many ill-advised social media posts, the story does not end there. During the brief period in which Leroy's Snapchat friends could view his post, another LMHS student took a screenshot of the post and re-posted it on Facebook and other platforms. Someone then re-posted the image along with commentary suggesting that the image belied the claim that Livingston Manor had "surpassed its dark history of being a Sundown Town with its own KKK Chapter." App'x 332, 357. That post with commentary was itself re-posted, this time with a caption

4

urging people to reach out to the school and providing contact information. Many people did reach out to the school to complain about the pictures. In total, school officials received twenty-three emails about the pictures, some identifying the students in the pictures, some labeling the behavior racist, some stating that it would make students feel unsafe, and many urging the school to take disciplinary action and hold the students accountable for their conduct.

Appellant John P. Evans, the District's Superintendent, and Shirlee Davis, the school's principal, asked Leroy and the other students involved not to come to school the next day, which Evans said was "for their own safety." App'x 473–74 ¶ 9. The school also asked the students who had been involved and their parents to meet with Evans and Davis, who questioned them about the posts.

The posts were a heated topic of conversation throughout the school. Staff and teachers held in-class discussions with students. The school planned an assembly for students in grades 7 to 12 to address the posts, scheduling the assembly at the same time as a planned student demonstration. After the assembly, the high school guidance counselor, Christian Towsley, and Evans supervised the demonstration, in which participating students knelt for nine minutes to symbolize the time Derek Chauvin held his knee on George Floyd's

neck.  After the demonstration ended, Towsley supervised a follow-up discussion about the photos, racism, insensitivity, and George Floyd.  Law enforcement officers were on school grounds throughout the day.

The response to the posts extended beyond the April 20 activities.  Evans released an official statement to the school community, posted on the District's website, in which he stated that the District was investigating the matter.  On April 21, News12 carried a story about the posts.  And the next month, the District held two days of training regarding implicit bias.

The District also launched an investigation into the posts, beginning with the student interviews on April 20.  On April 21, 2021, Leroy was suspended from school for five days—the maximum amount of time the school could suspend him under state law without holding a hearing.  The same day, the District hired Bethany Centrone, legal counsel for Capital Region BOCES, to investigate the matter.  She issued a report two days later concluding that there was sufficient evidence to determine that the students involved with the posts engaged in behaviors that violated the District's Code of Conduct and recommended that the students be referred to a Superintendent's hearing to determine if additional discipline was warranted.

Based on that recommendation, Evans charged Leroy with violations of the District's Code of Conduct for "posting racially offensive material on social media on or about March 25, 2021 and April 19, 2021 which resulted in a substantial disruption to the school environment." App'x 456. The District held a hearing on April 27, 2021, at which Leroy testified under oath, as did Evans.

When asked about disruption, Evans testified about the "emails and communications sent to both the superintendent and the principal from students, from staff, from people both inside of the community and outside of the community." App'x 278. He also discussed the "ongoing discussion among students throughout pretty much 7 to 12" the following day that was "kind of a buzz up the building," and the planned student demonstration and the assembly the school held "[k]ind of as a counter measure to that." *Id.* Evans testified that the assembly was "about a 15 to 20-minute conversation," after which he "then sent students back to class," and that "[s]everal students stayed after," and "spen[t] a few minutes in the gym afterwards for their protest I guess." App'x 279.

The next day, the hearing officer, Kate Reid, issued Findings of Fact and Recommendations calling for Leroy's suspension through May 21 with the option to return earlier if he signed a student contract agreeing to the proposed

suspension.  In particular, Reid found that Leroy had violated two provisions of the Code of Conduct that prohibited "[e]ngaging in any willful act which disrupts the normal operation of the school community" and "[e]ngag[ing] in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function."  App'x 461.

Evans suspended Leroy through May 21, 2021, and barred him from participating in all extracurricular activities for the remainder of the school year. Leroy was prohibited from playing football and baseball, going on the senior class trip, and attending the senior breakfast, the senior prom and graduation.  Leroy returned to school on May 10, 2021, after he signed a contract of conduct that included assurances he would "participate in any recommended Restorative Justice, Diversity, Equity and Inclusivity training opportunities offered or coordinated by the district."  App'x 468.  Leroy appealed Evans' decision to the Board, which affirmed the decision.

Leroy then sued the District and Superintendent Evans ("Defendants") in state court.  After the New York State Supreme Court granted him limited injunctive relief, Leroy was allowed to attend his high school graduation. Defendants then removed the case to the Southern District of New York.

Following discovery, Leroy moved for partial summary judgment and Defendants cross-moved for summary judgment in full. The district court granted Defendants' motion and denied Leroy's motion. The district court concluded that Defendants' disciplinary actions did not violate the First Amendment because the speech fell "outside of the First Amendment's ordinary protection" due to the "substantial disruption" Leroy's posts had caused. *Leroy v. Livingston Manor Central School District*, 2024 WL 1484254, at *10 (S.D.N.Y. April 5, 2024). The district court entered a final judgment and Leroy appealed.

## DISCUSSION

It is well-settled that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but that those rights are "applied in light of the special characteristics of the school environment." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969). Nor does the school environment toggle on and off based on a school campus's geographical boundaries; rather "the school's regulatory interests remain significant in some off-campus circumstances." *Mahanoy*, 594 U.S. at 188. The boundaries of those off-campus circumstances are not always clear. Here,

9

however, we conclude that Leroy's off-campus speech fell outside the bounds of the school's regulatory authority.

## I.    The *Tinker* and *Mahanoy* Standard

Two Supreme Court opinions guide our analysis.  In 1969, in *Tinker v. Des Moines Independent Community School District*, the Supreme Court addressed "the area where students in the exercise of First Amendment rights collide with the rules of school authorities."  393 U.S. at 507.  There, several students planned to wear black armbands to school in an effort to "publicize their objections to the hostilities in Vietnam and their support for a truce."  *Id.* at 504.  The school, after learning of the plan, created a targeted policy:  They would ask any student wearing an armband to school to remove the armband, and if the student refused, they would be suspended from school until they returned without the armband. *Id.*  The students wore black armbands to school as planned and were suspended. *Id.*

The Supreme Court rejected the school's efforts to suppress the students' expression, holding that students retain their rights to free speech and expression even in school.  *Id.* at 506.  However, the Court noted, those rights are "applied in light of the special characteristics of the school environment," and are therefore subject to some limitations within the school context.  *Id.*  The Court reasoned that

10

"conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of free speech." *Id.* at 513.

In *Mahanoy Area School District v. B.L.*, the Supreme Court applied this framework to off-campus speech. There, a student—referred to as B.L.—who was upset at not making the varsity cheerleading team posted an image on her Snapchat story showing her and a friend "with middle fingers raised," with the caption: "Fuck school fuck softball fuck cheer fuck everything." *Mahanoy*, 594 U.S. at 185. She posted a second blank image with the caption "Love how me and [another student] get told we need a year of jv before we make varsity but tha[t] doesn't matter to anyone else?" *Id.* Another student took pictures of the posts and shared them, "and the images spread." *Id.* "[S]everal cheerleaders and other students approached the cheerleading coaches 'visibly upset' about B.L.'s posts," and "[q]uestions about the posts persisted during an Algebra class taught by one of the two coaches." *Id.* The coaches suspended B.L from the junior varsity cheerleading squad, finding that she had violated team and school rules by using profanity in connection with a school extracurricular activity. *Id.*

11

Asked to consider "whether *Tinker* . . . applies to student speech that occurs off campus," the Supreme Court held that "we do not believe that the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus." *Mahanoy*, 594 U.S. at 187–88. The Court declined to create a general rule about what constitutes off-campus speech and when a school can regulate that speech. *Id*. at 189. Instead, the Court "mention[ed] three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech," and "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway." *Id.*

**First**, the Court noted that "a school, in relation to off-campus speech, will rarely stand *in loco parentis*," because "[g]eographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility." *Id.* **Second**, "from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day." *Id.* Thus, "courts must be more skeptical of a school's efforts to regulate off-campus speech,

12

for doing so may mean the student cannot engage in that kind of speech at all." *Id*. at 189–90. **Third**, "the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Id*. This is because "America's public schools are the nurseries of democracy," which relies upon the "marketplace of ideas." *Id*. at 190.

The Court concluded that given the different circumstances in which questions about regulation of off-campus speech might arise, "we can, as a general matter, say little more than this: Taken together, these three features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished. We leave for future cases to decide where, when, and how these features mean the speaker's off-campus location will make the critical difference." *Id*.

*Mahanoy* itself, the Supreme Court said, could provide one such example. *Id*. To decide whether that suspension violated B.L.'s First Amendment rights, the Supreme Court considered three factors—(1) the nature of the speech; (2) when, where, and how the student spoke; and (3) the school's interest in regulating the speech—and concluded that the school's regulation of B.L.'s speech was improper. *Id*. at 190–93. Ultimately, the Court concluded: "It might be tempting to dismiss

B.L.'s words as unworthy of the robust First Amendment protections discussed herein.  But sometimes it is necessary to protect the superfluous in order to preserve the necessary."  *Id.* at 193.

## II.    The District's Regulation Of Leroy's Speech

We use the same considerations to assess the District's regulation of Leroy's speech.  ***First***, consider the nature of Leroy's speech.  As in *Mahanoy*, Leroy's speech "did not involve features that would place it outside the First Amendment's ordinary protection," because it did not amount to fighting words or to true threats and was not obscene under the Court's jurisprudence.  *Id.* at 191.  While several students expressed the view that Leroy's post made them feel unsafe, his speech did not rise to the level of a "true threat" that would fall outside the scope of First Amendment protections.  Indeed, Leroy's post contained no threat at all, let alone a "'serious expression' conveying that a speaker means to 'commit an act of unlawful violence.'"  *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003) (alteration omitted)).  On the contrary, his speech was "the kind of pure speech to which, were [he] an adult, the First Amendment would provide strong protection."  *Mahanoy*, 594 U.S. at 191.

This is merely the starting point for our analysis.  Of course, if student speech on- or off-campus did constitute a "true threat," we would easily conclude

that a school could regulate or punish that speech without any need for extensive analysis under *Tinker* or *Mahanoy*, because that speech would fall outside the realm of First Amendment protection. But this does not mean that schools can **only** regulate speech that, by virtue of the true threat doctrine or some other doctrine, already lacks First Amendment protection. *Tinker* and *Mahanoy* make clear that because of the "the special characteristics of the school environment," *Tinker*, 393 U.S. at 506, the category of speech (both on-campus and off-campus) that a school can regulate is broader than the category of speech that lacks First Amendment protection writ large.[1] Because we determine that Leroy's speech would be protected speech outside of the school environment, we proceed to assess the circumstances of that speech and its connection to the school.

**Second**, we consider "when, where, and how" Leroy spoke. This, too, is virtually identical to the speech in *Mahanoy*. Like B.L.'s posts, Leroy's post "appeared outside of school hours from a location outside the school," he "did not identify the school in [his] posts or target any member of the school community with vulgar or abusive language," and he "transmitted [his] speech through a

---

[1] Thus, just because speech does not constitute a "true threat" does not preclude a school from regulating that speech. As discussed *infra*, schools may indeed have legitimate interests in regulating student speech that does not rise to the level of a "true threat" as we have defined it in the adult context but that nonetheless makes other students feel threatened or unsafe.

personal cellphone, to an audience consisting of [his] private circle of Snapchat friends." *Id.* "These features of [his] speech, while risking transmission to the school itself, nonetheless . . . diminish the school's interest in punishing [Leroy's] utterance." *Id.*

The District argues that "[s]ocial media has changed the boundaries of the schoolhouse gates." Appellee Br. at 43. We are cognizant that speech on social media is inherently different than private speech. A post on social media speaks to a much larger audience than a remark to a private or limited audience. It therefore carries both a greater risk of transmission to the school environment— and greater power to disrupt the school environment, including by harming other students. But we cannot accept the contention that in today's world, a social media post made off-campus is equivalent to speech on campus. That is because *Mahanoy* explicitly addresses social media and maintained a distinction between on- and off-campus speech, treating the social media posts at issue there as off-campus speech. *See Mahanoy*, 594 U.S. at 189 (holding that three features of off-campus speech "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway"). For better or worse, social media is a primary method of communication for students today, and allowing schools to

regulate all speech on social media as though it were on-campus speech risks preventing students from "engag[ing] in that kind of speech at all." *Id.* at 190. The fact that social media "risk[s] transmission to the school itself," *id.* at 191, does not automatically bring it within the bounds of the school's regulatory authority. True, the mass audience of a social media post, and the accompanying consequences of such speech, may strengthen a school's legitimate interests in regulating that speech. But we must still be "more skeptical of a school's efforts to regulate" it when it occurs off-campus. *See id.* at 189–90.

The circumstances of Leroy's speech also lacked any meaningful connection to the school. Leroy's audience of Snapchat "friends" included many students at the school, but that reflects the reality that students' social circles are largely composed of friends they make in school. Again, *Mahanoy* teaches us that the fact that off-campus speech is directed, in part, to those friends is insufficient to establish the required connection between the speech and the school environment. There, B.L. spoke to an audience of Snapchat "friends" that included many other students. And her post *was* about school—she complained about cheer, a school activity, wrote "fuck school," mentioned another student who also did not make the varsity cheer squad, and referred to other students who had made the squad.

17

*Id.* at 185. Here, Leroy's off-campus Snapchat post was significantly less related to school than the posts that fell outside the bounds of school regulation in *Mahanoy*.

**Third**, we consider the school's stated interest in regulating Leroy's speech. Three different interests are at play, two of which mirror those considered in *Mahanoy*. The record demonstrates that the school's decision to punish Leroy was motivated, at least in part, by the fact that "the perception of those images, what it depicts, is racist in nature," and the hope that "from this experience . . . [Leroy] has learned some valuable lessons that will serve him better down the road." App'x 287. In his summary judgment declaration, Evans opined that "the District has a significant interest in addressing racially offensive student speech and conduct." *Id.* at 478. In his letter to Leroy, Evans emphasized that the hearing officer's ultimate recommendation was intended to be "sufficient to ensure that [Leroy] understands the seriousness of his actions" and "sufficient to deter other students from engaging in similarly insensitive conduct." *Id.* at 464.

But as in *Mahanoy*, the strength of the school's interest in preventing certain kinds of speech—there, vulgarity, and here, racially insensitive speech—"is weakened considerably by the fact that [Leroy] spoke outside the school on [his] own time." 594 U.S. at 192. Also, as in *Mahanoy*, Leroy "spoke under

18

circumstances where the school did not stand *in loco parentis*," and "the school has presented no evidence of any general effort to [prevent such speech] outside the classroom." *Id*. These facts convince us that Livingston Manor's interest in teaching racial sensitivity is not sufficient to overcome Leroy's interest in free expression off-campus.

Moreover, the District had other means at its disposal to teach these values to its students, and it utilized many of them. Teachers led classroom discussions about the posts and the issues they raised. The District held an assembly about the same issues, facilitated a student demonstration, and led discussions for interested students. These steps demonstrate that penalizing speech is not the only way schools can foster important values. Often it will not be the most effective way to do so. And, most importantly for our purposes, the other methods at the District's disposal do not restrict speech.

Next, the district court's opinion and the District's brief here rely heavily on the District's interest in preventing disruption. *See Leroy*, 2024 WL 1484254, at *7–8. They assert that *Tinker* means a school can regulate any speech, on or off campus, that creates a substantial disruption or that the school reasonably believes will create such a disruption. *Id.* But this interest was also considered and rejected

in *Mahanoy*, under similar circumstances.  There, the Court found "no evidence in the record of the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action."  *Mahanoy*, 594 U.S. at 192.  Instead, "discussion of the matter took, at most, 5 to 10 minutes of an Algebra class 'for just a couple of days,'" and "some members of the cheerleading team were 'upset.'"  *Id.*  The Court concluded that "the alleged disturbance here does not meet *Tinker*'s demanding standard."  *Id.* at 193.

Here, too, the degree of in-school disruption does not justify restricting Leroy's speech.  The record reflects discussions about the posts in and out of class, leading to a fifteen-to-twenty-minute school-wide assembly and a nine-minute demonstration by several students.  We believe that this level of disruption did not give the school the authority to punish off-campus, otherwise protected speech that is only indirectly related to the school environment.  *See Tinker*, 393 U.S. at 508 ("[T]o justify prohibition of a particular expression of opinion, [a school] must be able to show that its action was caused by something more than the mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."); *Mahanoy*, 594 U.S. at 193 (same).

Nor does the **kind** of disruption relied upon by the school justify regulation of Leroy's speech.  The disruption at issue was not due to Leroy's speech alone, but was also driven by the independent decisionmaking of others, including fellow students, parents, and the District, in responding to Leroy's speech.[2]  *Tinker* suggests that the more relevant question is "disorder or disturbance **on the part of the petitioners**"—that is, disturbance on the part of the speakers themselves.  393 U.S. at 508 (emphasis added).  This distinction is in line with the First Amendment principles the Supreme Court sought to uphold in *Tinker*:

> Any departure from absolute regimentation may cause trouble.  Any variation from the majority's opinion may inspire fear.  Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance.  But our Constitution says we must take this risk, and

---

[2] The concurrence takes issue with this distinction, arguing that "if the speech does cause a significant reaction, and specifically if it makes students fear for their safety and thereby disrupts learning, *and* the speaker recklessly provoked just that response, he can hardly complain that he is being punished for someone else's reaction." Concurrence at 29–30.  We do not disagree.  But we believe the critical distinction between that case and this one lies not in the nature or cause of any disruption, but in the need to protect students' safety.  Suppose a student posts a highly controversial political view on social media—support for an unpopular candidate, for example—knowing that it risks upsetting some of his classmates and provoking a strong reaction.  We would not hold that the speaker could be penalized for the speech because he "recklessly provoked" that response.  Speech that makes students feel unsafe is entirely different.  As set forth below, protecting the safety of the entire school community is an important, independent school interest that may justify regulation of even off-campus speech—and perhaps even speech that does not cause an immediate in-school disturbance.  For this reason, it is an interest we believe should be analyzed separate and apart from the minutes of school disruption caused by the speech.  Indeed, *Tinker* makes clear that these are separate categories where First Amendment protections may fall away in the school context: "But conduct by the student, in class or out of it, which for any reason . . . materially disrupts classwork *or* involves substantial disorder *or* invasion of the rights of others is, of course, not immunized by the constitutional guarantee of free speech."  *Tinker*, 393 U.S. at 513.  Regardless, the concurrence does not suggest that Leroy recklessly provoked an in-school disturbance.  As discussed below, the record reflects the opposite.

> our history says that it is this sort of hazardous freedom—this kind of
> openness—that is the basis of our national strength and of the
> independence and vigor of Americans who grow up in and live in this
> relatively permissive, often disputatious, society.

*Id.* at 508–09. Tying a student speaker's constitutional right to free expression solely to the reaction that speech garners from upset or angry listeners cannot be squared with those principles. The disturbance in school the day after Leroy's posts does not justify regulating his speech.

Finally, this appeal raises a third school interest not present in *Mahanoy*: a school's interest in protecting members of the student body from offensive speech. *Tinker* recognized that in the school context, some speech may lose constitutional protection where it involves "invasion of the rights of others." 393 U.S. at 513. In this case, several students emailed teachers and the administration to report that Leroy's speech made them feel unsafe or uncomfortable. They reported that "posts like these can make students feel unsafe in their own school," App'x 295, "[a]ll POC students at LMCS are harmed and may even feel unsafe by the behavior demonstrated by these two students," *id.* at 307, "[t]he post had made me feel like it came from a place of hatred and makes me feel unsafe because at the end of the day these are people['s] lives and should not be treated as a running

joke," *id.* at 313, and that they did not "feel comfortable being around classmates who happ[ily] make light of murder," *id.* at 344.

Leroy's speech therefore implicates the first feature of off-campus speech discussed in *Mahanoy* in a manner that B.L.'s speech did not. As the Supreme Court explained, "a school, in relation to off-campus speech, will rarely stand *in loco parentis*," because off campus, the students' "actual parents" can "protect, guide, and discipline them." *Mahanoy*, 594 U.S. at 189. But when student speech off campus makes students feel unsafe on campus, schools may have an important parental role to play with respect to that speech. It still may not be the school's job to "guide" and "discipline" students for their off-campus actions, but it certainly falls to the school to "protect" the school community by ensuring that students feel safe at school.

We, however, are required to balance this consideration with the other two features of off-campus speech emphasized by *Mahanoy*. The Court noted that "the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Id.* at 190. And "from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters

during the full 24-hour day." *Id.* at 189. If schools can regulate off-campus expression because it upsets other students, they are effectively authorized to prohibit students from expressing unpopular views—in or out of school.

This conundrum requires us to draw a line between speech that is deeply offensive to other students—even reasonably so—and speech that threatens their sense of security. Schools can and must protect the school community from threats—including those that are not explicit or overt enough to rise to the level of "true threats"—that make students fear for their safety. We do not disagree with the concurrence's recognition of schools' critical responsibility to provide students the opportunity to "learn without fear." Concurrence at 10; *see generally* Concurrence at 8–13. But schools cannot—and should not—protect the school community from hearing viewpoints with which they disagree or engaging in discourse with those who have offended them. We readily acknowledge that doing so will at times be difficult. As *Mahanoy* emphasized, "schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* at 190. The ability to engage in civil discourse with those with whom we disagree is an essential feature of a liberal education.

24

Teaching students that they can and should be sheltered from speech that offends them is not.  At bottom, schools may sometimes restrict or penalize off-campus speech because it is threatening, but they cannot do so because it is offensive.

The line between the two will not always be clear, and getting it right is important.  Drawing the line too broadly carries significant dangers; courts cannot simply dismiss student expressions of fear as mere offense.  On the other  hand, drawing the line too close to the latter category carries a serious risk of chilling students' expression of unpopular opinions or any speech at all on sufficiently controversial topics.  After all, as much as we may hope that students will be attuned to the sensitivities of their classmates, they may not always know how their speech will be perceived by others.  Here, for example, crediting Leroy's testimony, he did not understand the offensive implications of his post.  And as soon as he did, he took it down and urged his friends to do the same.  If schools can punish such speech even when it occurs off-campus, we see a real risk of deterring students from coming anywhere near controversial topics.  We are called on to avoid such a chilling effect, even when doing so "shield[s] some otherwise proscribable" speech.  *Counterman*, 600 U.S. at 75.  The risk of chilling students' constitutionally protected speech counsels caution, particularly when it comes to

off-campus speech. In so stating, we do not suggest "that student feelings can be dismissed as mere offense, not fear." Concurrence at 14. Rather, we acknowledge the significant and competing considerations that must inform a school's decisionmaking.

Although we recognize that adopting a bright line test here would aid schools in making these difficult determinations in future cases, we do not believe we can or should set out an exhaustive list or a broad rule about what speech falls on the "protected" side of the line as opposed to the "proscribable" side of the line. *See Mahanoy*, 594 U.S. at 189. Our responsibility is to decide the case before us, and we do not presume to envision, much less account for, every other complex scenario schools may face.

Here, we conclude that the interest in protecting students on campus does not justify the District's response to Leroy's speech for two primary reasons.[3] *First*, the record is devoid of any indication that protecting students' sense of security was the District's interest in punishing Leroy. To the contrary, the hearing

---

[3] We do not suggest that these are the only relevant considerations. For example, we agree with the concurrence that "the broader context of the school community is particularly important to how a student would perceive the speech," and that "if there had been a recent pattern of harassment against a school's small Black student population, then a student might reasonably be more likely to see a given incident as another act in that pattern." Concurrence at 15.

officer's recommendation was based on the desire to "impose a penalty that is sufficient to ensure that [Leroy] understands the seriousness of his actions and that is sufficient to deter other students from engaging in similarly insensitive conduct." App'x 462. Evans' Affidavit below explained that he "believe[s] the District has a significant interest in addressing racially offensive student speech and conduct." *Id.* at 478. These statements express a desire to punish the speech because it was viewed as offensive—not because it was viewed as threatening or because it made other students fear for their safety.

***Second***, the record is clear that Leroy did not intend to threaten, bully, or harass any other students. It is undisputed that Leroy removed the picture from his Snapchat story within minutes, as soon as he learned how people were reacting to it. *Id.* at 95–97, 112–19, 215–18, 553–54. It follows that Leroy did not want to provoke that reaction.[4]

In sum—balancing (i) the nature of Leroy's speech; (ii) when, where, and how he spoke; and (iii) the school's interests in teaching racial sensitivity, in preventing disruption in school, and in protecting the school community—we

---

[4] The concurrence would insert a finding of intent as a prerequisite to regulating student speech off-campus that makes other students feel unsafe. We decline to engage with that proposal because we need not adopt such a rule to resolve this case and because we are mindful of the Supreme Court's reluctance to adopt any bright line rules in *Mahanoy*.

conclude that the school's interests here do not justify the regulation of Leroy's

speech, which otherwise would be protected by the First Amendment.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court

and **REMAND** for further proceedings.

24-1241-cv
*Leroy v. Livingston Manor Central School District*

MYRNA PÉREZ, *Circuit Judge*, concurring:

In our public schools, off-campus speech has on-campus consequences. That is only becoming more true as students increasingly live their lives and interact with their classmates online. What students say and do to each other off campus can be distracting during the school day, and figuring out how students can still learn together under those circumstances is a big part of what schools do. But when students are threatened, bullied, harassed, or otherwise made to fear for their safety off campus, they carry that fear with them to school the next day too. Schools must then decide in real time, without the time and space enjoyed by courts, how to respond to student speech, including sometimes with punishment.

This case arose out of one such decision to punish off-campus student speech, made by the Livingston Manor Central School District (the "District"). The majority opinion concludes that the District overstepped its authority in this case but does not, in my view, sufficiently explain to schools or district courts precisely why. While I see this as a close case, I concur in the judgment of the Court that the District's severe punishment of Case Leroy in this instance was not consistent with the First Amendment. I write separately because I believe the Supreme Court has

given us more guidance as to how future courts should apply the First Amendment to off-campus student speech than the majority opinion suggests.

## I.

Our public schools bear a heavy burden to educate all of the students in their charge, and so they have a "compelling interest in having an undisrupted school session conducive to the students' learning." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2362 (2025) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972)). But schools also have to give students the space to express themselves and learn from others' reactions, on and off campus. Schools are thus tasked with sorting student speech that is merely annoying, provocative, or offensive, from that which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). Schools operate in the shadow of the First Amendment, but just as students do not "'shed'" their rights "'at the school house gate,'" nor do schools' interests "always disappear" when speech "takes place off campus." *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 187–88 (2021) (quoting *Tinker*, 393 U.S. at 506).

*Mahanoy* was the Supreme Court's first foray into school regulation of "true off-premises student speech." 594 U.S. at 194 (Alito, J., concurring). By the Court's

own admission, it declined to "set forth a broad, highly general First Amendment rule" to govern future off-campus student speech cases, and instead it left "for future cases to decide where, when, and how" a student "speaker's off-campus location will make the critical difference" in whether school regulation comports with the First Amendment. *Id.* at 189–90 (majority opinion). But in lieu of a simple rule or test, the Supreme Court gave us "one example" of speech that had too little connection to school to be regulated and some general principles, from which I believe we can derive a more coherent approach for future cases. *Id.*

Those principles can be summarized in four essential guideposts for First Amendment cases like this. First, schools can regulate at least some speech that occurs truly off campus, *id.* at 188–90—that is, that speech that occurs outside of any "temporal or spatial extension of the regular school program." *Id.* at 203 (Alito, J., concurring).[1] Second, *Tinker* applies meaningfully off campus, meaning

---

[1] *See id.* (listing, as examples of settings that schools can likely regulate in a manner similar to the actual school day, "online instruction at home, assigned essays or other homework, and transportation to and from school," and "statements made during other school activities in which students participate with their parents' consent, such as school trips, school sports and other extracurricular activities that may take place after regular school hours or off school premises, and after-school programs for students who would otherwise be without adult supervision during that time"); *id.* at 188 (majority opinion) (listing (1) "the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities;" and (2) "breaches of school security devices, including material maintained within school computers;" (3) speech during "times when the school is responsible for the student;" (4) speech in "the school's immediate surroundings;" (5) speech during "travel en route to and from the school;" (6) "speech taking place over school laptops or on a school's website;" (7) "speech taking place

"schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others,'" and that interest does not "always disappear when a school regulates speech that takes place off campus." *Id.* at 188–89 (quoting *Tinker*, 393 U.S. at 506).[2]  Third, those interests are somewhat diminished off campus by the need to avoid intruding on the sphere of parents' authority, restricting student speech 24/7, or stifling students' development as participants in our "marketplace of ideas." *Id.* at 189–90 (quotation marks omitted).  Fourth, despite those considerations, there is broad consensus that "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students" are paradigm examples of speech schools may regulate even if it originates off campus.  *Id.* at 188; *see also id.* at 207–09 (listing similar categories as raising difficult questions).

---

during remote learning;" (8) speech during "activities taken for school credit;" (9) "communications to school e-mail accounts or phones;" and potentially (10) "speech related to extracurricular activities").

[2]    In *Mahanoy*, the Supreme Court acknowledged that on campus, and in settings that are functionally equivalent to the campus, the Court has recognized "three specific categories of student speech that schools may regulate," even when they do not cause much disruption, including "(1) 'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds, (2) speech, uttered during a class trip, that promotes 'illegal drug use,' and (3) speech that others may reasonably perceive as 'bearing the imprimatur of the school,' such as that appearing in a school sponsored newspaper." *Id.* at 187–88 (citations omitted). The Court did not suggest those categories, and particularly the power to punish speech on topics that are simply inappropriate for school (e.g., sex and drugs), have any applicability to true off-campus speech.

Applying these general principles to the present case is not an easy task, but I cannot join in certain aspects of the approach taken by the majority opinion. The speech at issue here is open to interpretation, but many interpreted it as making fun of, if not celebrating, the murder of George Floyd. The majority opinion decides Leroy's speech was only offensive, not threatening, bullying, or harassing, and that it lacked any meaningful connection to the school. But this seems to be based on the majority's own subjective judgment and is not fully explained. The majority opinion mentions that Leroy did not make a "true threat," that his speech was disseminated via social media, that the resulting disruption was caused partly by the reactions he provoked in others rather than from his speech directly, and that he claimed not to realize his speech was commenting on Floyd's murder. But it is not clear how these factor into the decision or why. If similar facts were treated as dispositive or important in future cases, schools and courts would be led astray.

In my view, while *Mahanoy* did not lay down one rule for every off-campus speech case, it nonetheless contains the elements of a coherent approach to at least some off-campus speech cases. Specifically, *Mahanoy* tells us that, at a minimum, schools can regulate off-campus speech that has the potential to disrupt student learning in the same way threats, harassment, and bullying do—by undermining

5

students' feelings of safety and security at school, which are basic prerequisites for learning. And *Mahanoy* makes clear that neither the *Tinker* standard nor "true threats" doctrine alone can draw the boundary between permissible and impermissible regulation of off-campus speech. Schools' *Tinker* interests in preventing disruption are "diminished" off campus, *Mahanoy*, 594 U.S. at 190, but schools' authority must extend further than the criminal law of true threats, since more general threats, as well as much bullying and harassment, can materially disrupt student learning even if they do not "communicate a serious expression of an intent to commit an act of unlawful violence." *Mahanoy*, 594 U.S. at 207 n.18 (Alito, J., concurring) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).[3]

Thus, applying *Mahanoy* in light of other precedent requires us to borrow concepts from both. Schools may regulate off-campus speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others," *Tinker*, 393 U.S. at 513, and specifically they may protect students "from the disruption that fear engenders" even if not literal "fear of violence" committed

---

[3]       Crucially, the majority correctly acknowledges that its "true threat" assessment is "merely the starting point for [its] analysis" and that their assessment "does not mean that schools can *only* regulate speech that, by virtue of the true threat doctrine or some other doctrine, already lacks First Amendment protection." Maj. Op. at 14–15. But as discussed herein, courts should delve deeper to determine if the nature of the speech at issue engenders disruptive forms of fear outside of the confines of a "true threat" analysis.

6

by fellow students, *Black*, 538 U.S. at 360 (quotation marks omitted). But to avoid overstepping the limits on their power laid out in *Mahanoy*, they may only regulate speech made with some degree of "intent," *id.*, or another "culpable mental state," *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). As explained below, this approach is faithful to precedent and largely consistent with today's majority opinion. Under this standard, this case would be close at the summary judgment stage, but ultimately the District's justification for the severe punishment it imposed here falls just short.

## II.

The first part of a framework for evaluating school regulation of off-campus speech focuses on the effect that speech must have, or be expected to have, in order to be regulable. We know schools can regulate some, but presumably not all, off-campus speech that materially disrupts student learning. This case does not offer the occasion to list every kind of disruption that might justify regulating off-campus speech. But this case typifies one kind of disruption that can support school intervention into off-campus speech: speech that makes students feel unsafe at school and thus less able to learn effectively. For the reasons explained below, in the unique context of public schools, this category must not be construed too

narrowly, and cannot simply be coextensive with "true threats" that communicate "serious expression[s] of an intent to commit an act of unlawful violence." *Black*, 538 U.S. at 359. Neither *Mahanoy* nor any other precedent requires such a restrictive understanding of school authority. As discussed in the next section, students' liberty interests can be protected without requiring schools to bear all of the consequences of unchecked off-campus threats, bullying, and harassment.

## A.

The common thread running through threats, bullying, and harassment— the types of off-campus speech that all generally agree must be regulable at least some of the time—is that they disrupt student learning by causing students to fear for their safety. While fear is not the only emotion that can disrupt learning,[4] it is uniquely detrimental to students' ability to learn, and it must be within schools' power to protect both their students' physical safety and their feelings of safety.

---

[4]     Nor do I wish to suggest fear is the only emotion that may be caused by threats, bullying or harassment, or the only one that can justify regulation of off-campus speech. This case does not present the question, for example, of when schools can regulate a "deliberate disturbance" that "may cause pandemonium in a public school" because it has an explicit nexus to the school, such as ridicule or threats aimed at teachers and administrators or speech intentionally lobbed into the school setting from off-campus and intended to cause disruption. *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 219–22 (3d Cir. 2011) (en banc) (Jordan, J., concurring) (discussing case of off-campus ridicule of school principal). *See generally J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011) (similar to *Layshock*); *Doninger v. Niehoff*, 642 F.3d 334 (2d Cir. 2011) (addressing off-campus speech specifically encouraging classmates to disrupt school); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34 (2d Cir. 2007) (addressing off-campus speech that was "potentially threatening" to a teacher because it included imagery of the teacher being shot, which was not a "true threat" but still "foreseeably create[d] a risk of substantial disruption").

8

*See Morse v. Frederick*, 551 U.S. 393, 424–25 (2007) (Alito, J., concurring) ("The special characteristic [of the school setting] that is relevant in this case is the threat to the physical safety of students . . . . During school hours . . . parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted."). *Mahanoy* is clear that schools "rarely stand *in loco parentis*" "in relation to off-campus speech," but rarely is not never, and when it comes to ensuring students feel safe at school, where parents cannot ensure their children feel safe, schools play precisely that role. *Mahanoy*, 594 U.S. at 189; *see* Maj. Op. at 22–23.

It is particularly important for schools to play this role in appropriate cases because "[p]ublic education is a public benefit," *Mahmoud*, 145 S. Ct. at 2359, and public school occupies a unique place in the lives of children and families in the United States. "The education of children within a specified age range is compulsory," and "by choice or necessity, nearly 90% of the students in this country attend public schools," *Mahanoy*, 594 U.S. at 199–200 (Alito, J., concurring). That is largely because "alternatives can be prohibitively expensive," *Mahmoud*, 145 S. Ct. at 2360. As a result, most children have to show up almost every day, and most parents have to send them, even if both have very good reasons for not

wanting to do so—even if they feel unsafe. *See Morse*, 551 U.S. at 424 (Alito, J., concurring) (recognizing that "[s]tudents may be compelled on a daily basis to spend time at close quarters with other students who may do them harm," and concluding schools can regulate "speech advocating illegal drug use" based on a highly attenuated risk of violence). Schools are responsible, then, for offering at least the minimal level of protection required for all students to learn without fear.

Protecting students' safety and feelings of safety also directly implicates the interests long ago recognized under *Tinker*. A growing body of research supports any parent or teacher's intuition that students must feel safe and secure to learn effectively. *See generally* Johanna Lacoe, *Too Scared to Learn? The Academic Consequences of Feeling Unsafe in the Classroom*, 55 Urb. Educ. 1385 (2020) (discussing literature on and evidence of the relationship between feelings of safety and academic achievement); Yuko Mori, et al., *Feeling Unsafe at School and Associated Mental Health Difficulties Among Children and Adolescents: A Systematic Review*, 8 Child. 232 (2021) ("[P]erceived school safety . . . was a strong independent risk factor that was associated with being bullied and mental health difficulties."). Student safety is thus of concern to schools not only because schools sometimes stand *in loco parentis*, but also because ensuring students feel safe is essential to

10

their "basic educational mission." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)); *see Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1058 n.13 (2d Cir. 1979) (Newman, J., concurring) ("School authorities ought to be accorded some latitude to regulate student activity that affects matter of legitimate concern to the school community, and territoriality is not necessarily a useful concept in determining the limit of their authority."). Any "threat to the physical safety of students" implicates a "special characteristic of the school setting" that "alter[s] the usual free speech rules." *Morse*, 551 U.S. at 424 (Alito, J., concurring).

Obviously, if students fear their classmates will hurt them, they will be less able to learn. But learning can also be disrupted if students believe their classmates will callously cheer on or condone their being harmed outside of their schools. Students come to school with all kinds of fears about how they and those they love could be harmed inside and outside of school—whether they fear police brutality, forcible family separation by immigration authorities, religiously-motivated attacks on their houses of worship, sexual or gender-based violence, or any other type of targeted state or private violence. Those fears doubtless weigh on students as they try to learn, so they implicate the state's "compelling interest" in

11

maintaining an environment "conducive to the students' learning." *Mahmoud*, 145 S. Ct. at 2362 (quotation marks omitted). And those fears often weigh on specific students with specific life experiences, whether they are targeted individually or based on membership in a group. While classmates and schools may not be responsible for (or capable of) assuaging those worries, schools must have authority to step in to stop them from being made worse.

Focusing on the effect these forms of speech cause, at least in the off-campus context, also helps to resolve a critical tension inherent in regulating threats (other than "true threats"), bullying, and harassment. On one hand, schools "not only *can*" but "sometimes *must*, pursuant to their affirmative obligations under Title VI, Title IX, the Rehabilitation Act of 1973, and the Fourteenth Amendment," regulate speech that denies students equal educational opportunities. Amicus Br. of ACLU at 16. On the other hand, the concepts of "bullying" and "harassment" "are not easy to define with the precision required for a regulation of speech." *Mahanoy*, 594 U.S. at 209 (Alito, J., concurring). On campus, this concern is lessened, because schools have more leeway to prevent and punish inappropriate in-school speech even absent substantial disruption. *See Mahanoy*, 594 U.S. at 187–88; *Morse*, 551 U.S. at 405 ("[T]he mode of analysis set forth in Tinker is not absolute."). On

12

campus then, a school ought to be able to enforce reasonable harassment and bullying policies that "ask not whether the speech could have foreseeably disrupted class, per *Tinker*, but instead whether it in fact constituted bullying or harassment." Amicus Br. of ACLU at 16. But applying such a policy off campus, to "all the speech a student utters during the full 24-hour day," would raise concerns. *Mahanoy*, 594 U.S. at 189. If First Amendment doctrine limited the speech schools may punish to include only abusive speech that is expressly targeted at one or more individuals, that would likely be both over- and underinclusive. It would insert schools in place of parents in regulating all manner of off-campus interactions between students, while at the same time placing broad threats to the community at large, and harassment and bullying implicitly targeted at vulnerable students or groups, entirely outside schools' reach. Focusing instead on whether speech in fact causes students to fear for their safety, inhibiting their ability to learn and implicating the school's compelling interests under *Tinker*, strikes an appropriate balance that protects the rights of speakers and hearers, as well as the rights of *all* students and their parents.

B.

The majority opinion and I broadly agree, then, that "[s]chools can and must protect the school community from threats—including those that are not explicit or overt enough to rise to the level of 'true threats'—that make students fear for their safety." Maj. Op. at 24–25. But, as the majority opinion observes, schools and courts face challenges in separating speech that causes *fear*, on one hand, versus that which causes mere *offense*, on the other, the latter generally being insufficient as a basis for regulating speech. *See Tinker*, 393 U.S. at 509 ("[The school] must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."). I am sensitive to the difficulty, but I cannot join in the majority opinion's approach, which could be interpreted to assert that student feelings can be dismissed as mere offense, not fear, because of the risk of too much regulation chilling legitimate expression on controversial topics. As discussed in the next section, I agree that there must be ample breathing space for protected speech. But in my view, the majority opinion did too little in accounting for legitimate fears and too summarily disposed of the school's interest in protecting students.

14

Rather, harmonizing our First Amendment precedent requires attention both to the objective context of the speech and the experiences of the students. Courts can objectively evaluate whether they are dealing with speech that a student could reasonably perceive as threatening, bullying, or harassing in context. For example, could a Black student reasonably perceive his classmate broadcasting a photo, apparently giving the thumbs-up to George Floyd's murder, as a jury begins deliberating over Derek Chauvin's guilt, as an act of racialized harassment? Whether speech was specifically targeted at an individual is relevant to but not dispositive of the objective part of the inquiry. Even speech broadcast to a wide audience can nonetheless impact certain hearers in the same way as if it were transmitted to them directly. *Cf. Mahanoy*, 594 U.S. at 193 (observing that school had not based its punishment of speech on "any specific negative impact upon a particular member of the school community"). And the broader context of the school community is particularly important to how a student would perceive the speech. For example, if there had been a recent pattern of harassment against a school's small Black student population, then a student might reasonably be more likely to see a given incident as another act in that pattern.

15

Courts and, if necessary, juries are also able to evaluate whether students' ability to learn was in fact materially disrupted, or whether schools reasonably forecast that their learning would be disrupted, or whether the concern was merely over annoyance, distraction, or offense. *Mahanoy*, 594 U.S. at 193 ("[S]imple 'undifferentiated fear or apprehension is not enough to overcome the right to freedom of expression.'" (alteration adopted) (quoting *Tinker*, 393 U.S. at 508)). In sorting this out, the standard methods of evaluating credibility, such as cross-examination, can do much of the work. *Cf. Maryland v. Craig*, 497 U.S. 836, 846–47 (1990) (repeating the description, attributed to Professor Wigmore, of cross-examination as the "greatest legal engine ever invented for the discovery of truth" (quotation marks omitted)). And giving appropriate weight to the views of school administrators and staff can do much of the rest. Schools perform "important, delicate, and highly discretionary functions," albeit "within the limits of the Bill of Rights." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943); *Thomas*, 607 F.2d at 1044 ("[P]rofessional educators must be accorded substantial discretion to oversee properly their myriad responsibilities."). In close cases, where courts may be ill-suited to discern whether a student complaining about a classmate's speech

was merely offended or felt truly unsafe, that student's teacher, who observed her demeanor and capacity to engage in class the next day, will have unique insight.

In short, assessing fear versus mere offense is difficult, but there is no reason why it should defy the usual factfinding processes. I agree wholeheartedly with the majority opinion that there must be a margin of safety around protected speech to avoid the chilling effects that the First Amendment guards against, but that does not require us to presumptively downplay or deny serious harms caused by certain off-campus speech. That said, if the inquiry ended with the harm—if schools could punish all speech that could reasonably be and is in fact perceived as threatening, bullying, or harassing—that would severely limit the First Amendment rights of students. The piece left out of the analysis to this point is the mental state of speakers. That, in my view, should be a key doctrinal protection for speakers' rights, as it is in other areas of First Amendment doctrine.

### III.

A critical safeguard that should limit schools' authority to punish off-campus student speech is the principle, familiar from other areas of First Amendment law, that culpability for speech depends on the speaking student's mental state. Limiting punitive school regulation of off-campus speech only to

speech undertaken with a culpable mental state will ensure schools do not overstep the specific limits on their power set out in *Mahanoy*, including by avoiding an unconstitutional chilling effect on legitimate expression; and it will limit the collateral harms of harsh school punishment. This approach is consistent with precedent, and focusing on the speaker's intent can help ensure that the majority opinion is not read too broadly to immunize large categories of even intentionally fear-inducing speech.

## A.

In my view, schools may only punish off-campus student speech, on the grounds that it disrupts student learning in a manner akin to threats, bullying, and harassment, where the speaker has a culpable mental state, likely recklessness. As the Supreme Court recently explained in *Counterman v. Colorado*, that is the mental state required for states to punish true threats of violence outside the school context, and it applies in a range of other First Amendment contexts to protect speakers' rights even when their speech in fact causes harm. 600 U.S. at 69. Again, schools' authority to protect students' safety and feelings of safety allow them to punish more than true threats. *See Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38 (2d Cir. 2007) ("[S]chool officials have significantly broader

18

authority to sanction student speech than the [true threats] standard.").  But the same reasons that support requiring recklessness in those areas apply here as well.

Like off-campus threats, bullying, and harassment directed at classmates, "[t]rue threats subject individuals to fear . . . and to the many kinds of disruption that fear engenders."  *Counterman*, 600 U.S. at 74 (discussing, in the threats context, "fear of violence" specifically) (internal quotation marks omitted) (quoting *Black*, 538 U.S. at 360).  The harm caused by the speech—the reason why the government has an interest in stopping it—"depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end."  *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)).  The same is true when speech is obscene, defamatory, or incites "imminent lawless action."  *Id.* at 73–78.

But "the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability" in order to avoid "a chilling effect."  *Id.* at 75.  The majority is right to be concerned about ensuring a margin of safety around protected student speech, and courts recognize this risk across First Amendment law.  "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries," because speakers may not know which side of the line they will fall on, or how it will be adjudicated, and may "steer[]

wide of the lawful zone" and "self-censor[]" even protected speech as a result.  *Id.*
at 75–76 (quotation marks omitted) (alteration adopted).  By protecting speech that
a speaker honestly but mistakenly believes will not cause harm, First Amendment
doctrine "reduc[es] an honest speaker's fear that he may accidentally or
erroneously incur liability" and "provides 'breathing room' for more valuable
speech."  *Id.* at 75 (quotation marks omitted) (alterations adopted).

A recklessness standard provides the right amount of protection here, for
similar reasons as in the true threats context.  As just discussed, too low a mental-
state requirement will cause self-censorship and infringe on protected speech.  But
the more stringent the requirement is, the greater the cost will be to schools and
other students, because it will shield more "otherwise proscribable . . . speech"
when there is doubt about the speaker's mental state.  *Id.* at 75.  "A person acts
recklessly, in the most common formulation, when he 'consciously disregards a
substantial and unjustifiable risk that the conduct will cause harm to another.'"  *Id.*
at 79 (alterations adopted) (quoting *Voisine v. United States*, 579 U.S. 686, 691
(2016)).  "[R]eckless defendants have done more than make a bad mistake"—an
experience common to almost all public school students at some point—because
"[t]hey have consciously accepted a substantial risk of inflicting serious harm."  *Id.*

20

at 80; *cf. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 124 (2d Cir. 2012) (Pooler, J., dissenting) ("[Young children] learn by fumbling their way to finding the boundaries between socially permissible, and even encouraged, forms of expression that employ exaggeration for rhetorical effect, and impermissible and offensive remarks that merely threaten and alienate those around them.").

Importantly, *Counterman* applied a recklessness standard to true threats, which may carry serious criminal penalties, even though "speech near the borderline of true threats" is "sometimes political."  *Counterman*, 600 U.S. at 81. The same may sometimes be said of borderline threatening, harassing or bullying off-campus speech, as this case shows, since Leroy's speech appeared to comment (crudely) on an issue of serious public concern.  Recklessness "offers enough breathing space for protected speech, without sacrificing too many of the benefits of" regulation, including protecting the rights of all students to learn, participate equally in their school communities, and benefit from the public education to which they are entitled.  *Id.* at 82 (quotation marks omitted).

## B.

The application of a heightened mental-state requirement to threatening, harassing, or bullying off-campus student speech is also consistent with precedent

21

in the school speech context. Several amici endorse the notion, arguably implicit in *Mahanoy*, that schools can regulate *at least* "true threats," which incorporates a mental state requirement as discussed above. *See* Amicus Br. of Ctr. for Indiv. Rts. & Prof. Eugene Volokh at 4, 6, 11–14; Amicus Br. of ACLU at 15–16; *Mahanoy*, 594 U.S. at 188; *id.* at 207–08 (Alito, J., concurring). Expanding regulation beyond explicit threats of "unlawful violence to a particular individual or group of individuals," *Mahanoy*, 594 U.S. at 208 n.18 (Alito, J., concurring) (quotation marks omitted), as schools must, makes a mental state requirement even more important.

True, we have said when applying *Tinker* to *on-campus* speech, that "[t]he test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Cuff*, 677 F.3d at 113. But in the context of off-campus speech, we have recognized that subjective mental state is relevant to whether schools should be able to exercise their on-campus disciplinary authority based on the effects of off-campus speech. *See Thomas*, 607 F.2d at 1050, 1052 n.17 (holding school could not regulate speech in newspaper that "was deliberately designed to take place beyond the schoolhouse gate," where "appellants diligently labored to ensure that [it] was printed outside the school, and that no copies were sold on school grounds," but distinguishing a "case in

which a group of students incites substantial disruption within the school from some remote locale"); *Doninger v. Niehoff*, 642 F.3d 334, 346 (2d Cir. 2011) (recognizing the role of this distinction); *Wisniewski*, 494 F.3d at 40 ("[The] foreseeability of both communication to school authorities . . . and the risk of substantial disruption is not only reasonable, but clear.  These consequences permit school discipline, whether or not [the student] intended [the disruption].").

Perhaps most importantly, permitting schools to regulate this kind of speech where it meets at least the heightened mental state requirement of recklessness is consistent with each of the three limits on school authority articulated in *Mahanoy*.

First, schools usually do not stand *in loco parentis* with respect to off-campus speech, because "the children's actual parents can[] protect, guide, and discipline them" off campus.  *Mahanoy*, 594 U.S. at 189.  But schools have a responsibility to protect the rights and safety of all students during the school day, and they may be positioned *better* than parents in some cases to understand the school context and observe student learning, on which the effects of off-campus speech are felt.

Second, schools must take care that their regulation of off-campus speech does not extend to "include all the speech a student utters during the full 24-hour day," which could "mean the student cannot engage in [a particular] kind of

23

speech at all." *Id.* at 189–90.  Thus, a recklessness standard plays an important role in eliminating the chilling effect of speech regulation, so that students know that they can generally say whatever they want off campus without fear that even a "bad mistake" will result in school discipline.  *Counterman*, 600 U.S. at 80.

Third, punishing off-campus speech when it involves a culpable mental state is consistent with *Mahanoy*'s admonition that, as "nurseries of democracy," "schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'"  *Mahanoy*, 594 U.S. at 190.  That is undoubtedly one valuable function served by schools, but it is not the only lesson schools should impart to students about living with others in "[o]ur representative democracy."  *Id.*  Students must have room to engage in "unpopular expression" without fear, *id.*, but they should also learn that some speech is both constitutionally protected and corrosive to the goal of living well in a pluralistic democracy.  *See generally Fraser*, 478 U.S. at 681 ("The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior.  Even the most heated political

24

discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences."). Being sensitive to the effect our words have on others is not a burden on liberty, but instead is part of living in a community and a country of diverse experiences and viewpoints. *See id.* ("Public education must prepare pupils for citizenship in the Republic. It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." (quotation marks omitted) (alterations adopted)). Hearing speech that is dehumanizing, or calls for or celebrates violence, may be one cost of the "hazardous freedom . . . that is the basis of our national strength." *Tinker*, 393 U.S. at 508–09. But it is a serious cost. Schools can and should teach students that when living in community, at school and beyond, freedom comes with responsibility, which sometimes includes moderating speech because of how others will react.

It may seem incongruous to use the same "recklessness" standard that applies to criminal threats (as well as civil regulation of speech, like defamation), but the seriousness of some school punishments, including Leroy's, underscores the importance of a culpable mental state. In many ways, suspension is nothing like the criminal punishments and crippling civil liability that government can

impose for other kinds of speech. But the lasting harm caused by school suspensions is well-documented, including the role they play in the phenomenon known as the "school-to-prison pipeline." *See generally* Paul Hemez, et al., *Exploring the School-to-Prison Pipeline: How School Suspensions Influence Incarceration During Young Adulthood*, 18 Youth Violence & Juv. Just. 235 (2020) (analyzing evidence of relationship between school suspensions and later incarceration). And the harms of suspensions mainly fall on students whose families are less likely to hire lawyers, or attract pro bono representation, to make a federal case out of their suspension. *See* Russell Skiba & Jeffrey Sprague, *Safety Without Suspensions*, 66 Educ. Leadership 38, 40 (2008) (discussing evidence that relatively few suspensions are actually targeted at safety issues, and that discriminatory enforcement is a serious problem). Schools, like other government bodies with the power to punish, must scrupulously observe the requirements of due process, and should be judicious in punishing no more than strictly necessary to serve the legitimate ends of punishment. As a general matter, it is more appropriate to punish conduct at any level that is undertaken with a culpable mental state similar to that adopted in *Counterman*. The very real stakes of school suspensions and

other punishments therefore provide additional support for incorporating such a requirement into the school regulation of off-campus student speech.

C.

Application of a heightened mental state requirement is necessary to ensure that two aspects of today's majority opinion are not overread to hamstring school regulatory authority.

First, the majority opinion downplays the difference between off-campus speech that is intended to be private or for a limited audience, and speech that is made to a wide audience including many members of the school community, on social media or otherwise. I acknowledge at the outset what should be obvious: The First Amendment is not intended only or even primarily to protect private conversations. The Constitution protects a robust public discourse, and protection of free speech would not mean much if we could speak only in hushed tones or behind closed doors. *Mahanoy* also makes clear that statements made on social media are not automatically equivalent to statements made in the classroom, even if students see speech on social media and have their phones with them in school.

But publicly broadcast speech is nonetheless more likely to be regulable by schools, not because it deserves less constitutional protection, but because in

practice the risk is far greater to make its way to classmates who will be harmed by it. A student who posts offensive, even vaguely threatening material on social media may well have no idea of the risk of harm he is causing, in which case he should not be punished. But many speakers will know that threatening, bullying, or harassing speech broadcast on social media is infinitely more likely to disrupt others' learning than the same comment made privately to a friend. If a speaker recklessly goes ahead anyway, it is not outside of a school's power to respond. In short, audience matters, context matters, and social media is part of that context in 2025. Social media is ubiquitous, but nobody, not even teenagers, expresses themselves only by posting for a mass audience. The ubiquity of social media may sometimes call for a lighter touch when regulating student speech, but it may also heighten schools' interest in addressing serious harms that result.

Second, the majority opinion emphasizes that "[t]ying a student speaker's constitutional right to free expression *solely* to the reaction speech garners from upset or angry listeners" would be untenable. Maj. Op. at 22 (emphasis added). I agree that "[t]he First Amendment's protection of free speech cannot hinge entirely on the reaction of a listener to a person's speech," because then "the First Amendment would only be as strong as the weakest, or at least the most thin-

28

skinned, listener in a crowd." *Cuff*, 677 F.3d at 120 (Pooler, J., dissenting). I agree that if a student has no idea his speech will disrupt anyone's learning, including if disruption results only because his speech was distorted or misrepresented, it hardly makes sense to punish that speaker, and he will not have acted recklessly.

But if substantial disruptions of the school environment and infringements on the rights of others somehow did not count if they were caused by "reactions" rather than actions, *Tinker* would not apply at all off campus, directly contrary to *Mahanoy*, 594 U.S. at 189. Neither today's opinion nor *Tinker* stands for the proposition that the school can only prevent disruption that results from the speaker himself or herself being loud or obnoxious. *Cf. Tinker*, 393 U.S. at 508 (rejecting school's effort to "punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners"). In *Tinker*, the Supreme Court held that the school could not punish the wearing of anti-war armbands because there was "*no indication* that the work of the schools or any class was disrupted," and the reaction amounted to "a few students ma[king] hostile remarks" "[o]utside the classrooms." *Id.* (emphasis added). But if the speech does cause a significant reaction, and specifically if it makes students fear for their safety and thereby disrupts learning, *and* the speaker

recklessly provoked just that response, he can hardly complain that he is being punished for someone else's reaction.

IV.

Applying the foregoing principles to Leroy's speech, I would find this to be a very close case. I agree with the majority that many of the emails that the District received, complaining about Leroy's speech and calling for a response from the District, can be construed as expressing offense, discomfort, disgust, and concern that students *might* feel "unsafe," but not actual feelings of unsafety. *See* J. App'x at 295, 298, 303, 307, 310, 317, 328, 338, 341, 344, 346, 348, 352, 356, 365, 367, 369, 373. I am wary of suggesting that there is a "magic words" test for complaints that justify a school response, but I can see how one would interpret those emails as expressing something more like mere offense. Importantly, though, several of the emails are not susceptible to that interpretation. One student stated that Leroy's speech in fact made her "feel unsafe," *id.* at 313, and while a jury might or might not believe her, the record is devoid of any reason to simply discard that statement at the summary judgment stage. And one parent indicated that they were "scared to send [their] daughter to school with the world we live in," which fear appears to have been exacerbated by Leroy's speech. *Id.* at 332. Further, it is not

30

appropriate to credit Leroy's disputed account of his mental state in granting him summary judgment. A reasonable jury certainly could disbelieve Leroy when he denies that he realized his post would be understood referring to the murder of George Floyd, *id.* at 97–100, given his awareness of current events and apparent reference to a previous incident in the caption: "Cops got another one."

Nonetheless, I reach the same result as the majority opinion, for two reasons. First, while student safety concerns may have furnished grounds to punish Leroy, the District described its own decision as being based on its view that his post was offensive, which generally is an inadequate justification for severe punishment of off-campus speech on its own. *Id.* at 278–79, 286–87, 462, 478; *Tinker*, 393 U.S. at 509. The District vaguely alluded to safety, but it appears to refer either to Leroy's safety, and that of other students involved in his speech, or to the risk that students would walk out of school, not that students would feel unsafe and have their learning disrupted as a result. J. App'x at 473–75, 479, 481–83, 485–86. Post hoc justifications offered in litigation, analogizing Leroy's speech to threats, harassment, or bullying, cannot alter the school's actual basis for his punishment.

Second, while a reasonable jury could find that Leroy knew he was making an offensive, tasteless, and racist joke, that is not the question. The key question is

31

whether Leroy intended or was reckless as to the risk that certain of his classmates would reasonably perceive the joke as threatening, bullying, or harassing, and would feel unsafe in school and have their ability to learn disrupted as a result. On that score, it is undisputed that Leroy tried to take the post down as soon as he learned how people were reacting to it, which indicates that he did not intend that reaction and did not consciously disregard the risks. *Id.* at 95–97, 112–19, 215–18, 553–54. Further, the District explicitly based its decision on its belief that Leroy was merely negligent, since a reasonable person in his position should have known the effect his speech would cause, even while finding that Leroy did not intend to harass or discriminate against anyone. *Id.* at 282–84, 286–87, 380, 389, 407.

Under these circumstances, I agree with the majority opinion that the severe punishment Leroy received was not consistent with the First Amendment. But today's opinion should not be understood to preclude schools from punishing off-campus student speech in the future, if that speech makes students feel unsafe and deprives them of the ability to learn and participate as equal members of their public-school community, if the speaker intends or is reckless as to that result.

\* \* \*

For all of the foregoing reasons, I respectfully concur only in the judgment.

32